### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| BILLIE EFFORD, JR., | CASE NO. 1:21-CV-00106-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Billie Efford, Jr. filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 14, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently assigned to me pursuant to General Order 2021-06. (Non-document entry of Feb. 18, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

1

PROCEDURAL BACKGROUND

Mr. Efford filed for SSI on October 31, 2018, alleging a disability onset date of March 15, 2013. (Tr. 296-97). His claims were denied initially and on reconsideration. (Tr. 210, 222). He then requested a hearing before an Administrative Law Judge. (Tr. 245). On February 7, 2020, the ALJ issued a written decision finding Mr. Efford not disabled. (Tr. 124-34). The Appeals Council denied Mr. Efford's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; *see* 20 C.F.R. §§ 416.1455, 416.1481). Mr. Efford timely filed this action on January 14, 2021. (ECF #1).

FACTUAL BACKGROUND

I.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Mr. Efford and VE Kenneth Browde, presented during the hearing before the ALJ.

Counsel for Mr. Efford offered an opening statement, noting Mr. Efford's condition has deteriorated since a prior unfavorable disability determination. (Tr. 143). Counsel explained Mr. Efford has three disc herniations in his lumbar spine with severe stenosis, difficulty with bowel and bladder control, back pain with numbness down his right leg, swelling in his legs, and difficulty walking, sitting, and standing. (Tr. 144).

Mr. Efford testified he lives with his mother, who is bedridden, and his brother. (Tr. 145). He does not have a driver's license. (*Id.*). Mr. Efford completed the eleventh grade. (Tr. 146). Since February of 2016, when his claim was initially denied by another ALJ, Mr. Efford has tried to work but was terminated from his last job when he started having back pain, leg swelling, and gout flares. (Tr. 146-47). Mr. Efford explained that his position required him to use a machine to wax

floors and collect trash throughout an office building. (Tr. 152). He stated that collecting the garbage required lifting and carrying more than twenty pounds and was difficult for him. (Tr. 152-53). Mr. Efford also tried working as a security guard for Whelan Event Staffing at Cleveland Browns stadium. (Tr. 149-50). Mr. Efford testified that chronic kidney disease causes his legs to swell and hurt. (Tr. 156). Sometimes his feet are so swollen that he cannot put on his socks and shoes. (*Id.*).

In a typical day, Mr. Efford gets up and showers. (Tr. 157). The hot water provides some brief relief. (*Id.*). After that, Mr. Efford spends his day watching television and shifting between sitting and prone positions. (*Id.*). His brother handles all the household chores and looks after Mr. Efford and their mother. (*Id.*). Mr. Efford is a homebody and does not spend time with friends. (*Id.*).

Mr. Efford testified he can sit for about thirty minutes before the pain in his back and legs require him to get up and stretch or move around. (Tr. 158). He lays down on and off for about six hours a day. (*Id.*). Mr. Efford can stand for about fifteen to twenty minutes before experiencing pain. (Tr. 159). He walks slowly, though sometimes he can barely walk. (Tr. 160). Mr. Efford cannot lift more than five pounds because of his back. (*Id.*). He reported recently telling his doctor about problems with bladder and bowel control. (*Id.*). For leg swelling, Mr. Efford's doctor advised him to elevate his legs above his chest to reduce swelling. (Tr. 162). For about an hour or two each day, Mr. Efford's pain becomes so bad that he has difficulty concentrating and cannot follow a television program. (*Id.*).

The ALJ noted emergency medical providers discussed back surgery with Mr. Efford. (Tr. 161). Mr. Efford explained that he declined the surgery because he was scared. (*Id.*). He knew

3

someone who went underwent back surgery and now walks with two crutches. (*Id.*). Mr. Efford was informed that he had waited too long to get injections for his back and leg pain. (Tr. 165-66). He tried physical therapy instead, but it did not help. (*Id.*). Mr. Efford explained that he used to take ibuprofen for his gout pain but, because of his kidney disease, he was advised to stop. (Tr. 163).

The VE then testified. He categorized Mr. Efford's past relevant work as a commercial cleaner, DOT 381.687-014. (Tr. 168). The ALJ asked if a hypothetical individual of Mr. Efford's age, education, and work history could perform Mr. Efford's past relevant work if restricted to light work and limited to the following: can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can never work at unprotected heights or near moving mechanical parts; and can never operate a motor vehicle. (Tr. 169). The VE testified that such an individual could not perform Mr. Efford's past relevant work but identified other positions the hypothetical individual could perform:

- Housekeeping cleaner (DOT 323.687-014), light exertion, unskilled;

- Cashier II (DOT 211.462-010), light exertion, unskilled; and

- Power screwdriver operator (DOT 699.685-026), light exertion, unskilled.

(Tr. 169-70). If further limited to two hours of standing and walking, the hypothetical individual could not perform Mr. Efford's past relevant work but could perform the following positions:

- Parking lot attendant (DOT 915.473-010), sedentary exertion, unskilled;

- Price marker (DOT 209.587-034), light exertion, unskilled; and

- Electrical accessories assembler (DOT 729.687-010), light exertion, unskilled.

4

(Tr. 172). The VE stated that these three positions could be accommodated with a sit/stand option at will, provided the worker remained on task. (Tr. 173). Employers expect a worker to remain on task 90 percent of the day or more. (*Id.*).

## II.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Efford was 33 years old at the time of his alleged onset date, and 40 years old at the time of the administrative hearing. (Tr. 143, 200). Mr. Efford completed the eleventh grade. (Tr. 146). In the past, Mr. Efford has been employed as a commercial cleaner. (Tr. 168).

## III.    RELEVANT MEDICAL EVIDENCE

On January 24, 2018, Mr. Efford went to the emergency room for muscle aches lasting three weeks, with the left arm and right foot progressively worsening. (Tr. 382, 383). Mr. Efford rated his pain at a seven on a ten-point scale. (Tr. 382). Mr. Efford reported his arm pain may be related to his new job duties. (Tr. 385). With the exception of tenderness to palpation on the plantar surface of his right foot, Mr. Efford's physical examination was normal. (Tr. 387). His foot X-ray showed a healed great toe fracture but was otherwise insignificant. (Tr. 388). Lab results revealed a mildly elevated level of creatine kinase. (Tr. 387). On discharge, Mr. Efford received a prescription for Naproxen. (Tr. 388).

On February 1, 2018, Mr. Efford returned to the emergency room with bilateral knee pain, foot pain, and muscle pains in his arms. (Tr. 474). Mr. Efford reported bilateral upper arm pain for two months, worse after work and exacerbated with raising his arms over his shoulders. (*Id.*). Mr. Efford displayed tenderness over his bilateral biceps and tenderness with supination and pronation of hands, but physical examination was otherwise normal. (Tr. 476). Mr. Efford received

Tylenol and Norflex at the emergency room and was discharged with a prescription for Tylenol. (Tr. 476).

On March 14, 2018, Mr. Efford went to the emergency room complaining of right ankle pain and reported a suspected gout attack. (Tr. 470). Medical providers observed an antalgic gait favoring his left leg. (*Id*.). Mr. Efford described the pain as constant and sharp, rated at eight. (*Id*.). Physical examination of the ankle revealed full range of motion with pain elicited with dorsiflexion, mild edema, and increased warmth. (*Id*.). The treating provider suspected a gout flare-up, provided colchicine, ibuprofen, and Percocet in the emergency room, and ordered prescriptions for ibuprofen 800 mg and colchicine. (Tr. 472). Because Mr. Efford had an antalgic gait and pain with ambulation, he received crutches upon discharge. (*Id*.).

On April 3, 2018, Mr. Efford returned to the emergency room complaining of left ankle pain. (Tr. 402). He rated his pain at nine on a ten-point scale, described it as throbbing and continuous, and attributed it to a gout flare-up. (*Id*.). Mr. Efford reported having gout in his left ankle about three weeks prior, for which he took medication. (Tr. 405). The gout symptoms returned a few days before he went to the emergency room. (*Id*.). Mr. Efford reported he was out of his usual medications for gout attacks, colchicine and ibuprofen. (*Id*.). Mr. Efford noted the pain was worse with weightbearing and he had difficulty with ambulation due to pain. (Id., Tr. 407). On examination, he maintained full range of motion in the left ankle, albeit with some pain and tenderness to palpation. (*Id*.). A left ankle X-ray revealed mild soft tissue swelling. (Tr. 412). Mr. Efford was discharged with prescriptions for ibuprofen 600 mg and colchicine. (Tr. 409).

On April 30, 2018, Mr. Efford saw Idya Kumar, M.D., at Broadway Health Center. (Tr. 449). Records indicate a history of chronic gout beginning in 2011. (Tr. 446). He received amlodipine for hypertension. (Tr. 449).

On August 29, 2018, Mr. Efford went to the emergency room with shoulder and chest pain. (Tr. 466). The pain, located at the right lateral neck and migrating into the shoulder, upper trapezius, and upper chest region, was exacerbated by movement. (*Id.*). Mr. Efford's EKG was normal. (*Id.*). The emergency room provider felt Mr. Efford had a muscle spasm or strain. (*Id.*). Mr. Efford was administered intramuscular injections of Toradol and Norflex, and received prescriptions for ibuprofen and Flexeril. (Tr. 466-67).

On November 4, 2018, Mr. Efford went to the emergency department for right posterior thigh pain. (Tr. 464). He exhibited tenderness to palpation of the posterior thigh but did not have lower extremity swelling. (*Id.*). The treating provider suspected a muscle strain. (*Id.*).

On November 8, 2018, Mr. Efford went to the emergency room for low back pain that radiated down his right leg. (Tr. 459). He denied numbness and tingling but endorsed disturbed sleep because of the pain. (*Id.*). On physical examination, Mr. Efford had right sided paraspinal lumbar tenderness. (*Id.*). Mr. Efford was discharged. (Tr. 460).

On November 19, 2018, Mr. Efford presented at the emergency room with low back pain, dull and aching, and some associated sharp pain shooting down the back of his right leg and stopping just above the knee. (Tr. 455). Physical examination was normal, except Mr. Efford displayed a reproducible trigger point "overlying the L4-L5 right paralumbar musculature to include its insertion over the posterior superior iliac spine." (Tr. 456). Mr. Efford exhibited normal strength in all extremities and had a normal gait. (*Id.*). He was diagnosed with acute low back pain

with sciatica. (*Id.*). Mr. Efford received Toradol, Norflex, and Percocet at the emergency room. (*Id.*).

On November 27, 2018, Mr. Efford went to the emergency room with back and radiating right leg pain. (Tr. 451). Mr. Efford noted ibuprofen was no longer relieving the pain. (*Id.*). He reported that a recent prescription for Percocet helped for only a short period of time. (*Id.*). Mr. Efford stated he had an upcoming appointment with a pain management clinic but was requesting something for the pain to hold him over until the appointment. (*Id.*). Physical examination was normal, except the emergency room provider noted Mr. Efford displayed difficulty rising from a seated position. (*Id.*). Mr. Efford received Toradol and Norflex at the emergency room and was discharged with prescriptions for Motrin and Flexeril. (Tr. 453).

Mr. Efford attended physical therapy sessions through University Hospitals and worked with Matthew Yanik, D.P.T. (Tr. 543). At his initial evaluation on December 24, 2018, Mr. Efford reported chronic low back pain, bilateral hamstring cramping, and more pain with sitting than standing. (*Id.*). Mr. Efford denied needing assistance with walking, sitting, or standing. (*Id.*). Mr. Efford endorsed persistent pain at night, changes/problems with bladder and bowel function, joint swelling, balance problems, and sudden weakness. (Tr. 547). On observation, Dr. Yanik noted Mr. Efford appeared uncomfortable, leaning to the right when sitting, and standing up periodically during the forty-minute session. (Tr. 544-45). He exhibited some decreased lumbar range of motion and displayed an antalgic gait to the right with decreased gait speed. (*Id.*).

Mr. Efford saw Dr. Yanik again on January 8, 2019. (Tr. 548). He noted some relief with the exercises but reported pain with hamstring stretching and seated back stretching. (*Id.*). He continued to have frequent hamstring cramping and numbness in the lower right leg. (*Id.*). Mr.

Efford reported some relief with the TENS unit and pelvic tilts but had poor activity tolerance to treatment generally. (Tr. 549).

At physical therapy on January 15, 2019, Mr. Efford reported that his pain was still present but less frequent. (Tr. 551). He also reported some numbness in his legs throughout the day. (*Id.*). His tolerance for activity was much improved. (Tr. 552). His gait was described as wide-based, and his hips were forward flexed. (Tr. 551).

Mr. Efford saw Dr. Yanik again on January 22, 2019. (Tr. 553). He continued to report cramping in the right leg and low back, though he had no pain in the left leg. (*Id.*). This was Mr. Efford's last physical therapy visit. Dr. Yanik discharged Mr. Efford because his progress plateaued. (Tr. 556). Though Mr. Efford experienced some pain relief with therapy, the relief was short-lived and returned with movement. (*Id.*). His gait was semi-wide-based and flexed forward. (Tr. 553).

On March 5, 2019, Mr. Efford returned to the emergency room for low back pain, described as sharp and burning, and beginning just above the right hip and extending posteriorly along the gluteus and hamstring compartments with some associated occasional lateral toe paresthesia. (Tr. 512). Mr. Efford reported having a prescription for Neurontin but had not taken it recently. (*Id.*). Physical examination was normal, except Mr. Efford had reproducible trigger point and associated spasm of the right inferior paralumbar musculature at L4-L5. (Tr. 513). He received Toradol and Norflex in the emergency room and a five-day course of prednisone. (Tr. 513-14).

On April 1, 2019, an MRI radiologist instructed Mr. Efford to go to the emergency room. (Tr. 519). Mr. Efford complained of new bowel urgency, but not incontinence, and some urinary leaking and hesitancy. (*Id.*). Mr. Efford also reported worsening right-sided lower back pain

radiating into his right leg, some increasing numbness and tingling in the right foot and lower ankle, and difficulty walking. (*Id.*). He said his legs feel weak sometimes. (Tr. 524). His MRI revealed "a central and superiorly migrated right paracentral disc herniation" with "severe central canal stenosis," and "severe right lateral recess stenosis at L5-S1" (described as severe nerve root impingement with signal loss), (Tr. 520, 523), "severe right lateral recess stenosis" at L4-L5, and a diffuse disc bulge at L3-L4 "causing mild central canal stenosis." (Tr. 527). Given these significant findings, Mr. Efford was offered surgical intervention, but he declined. (*Id.*). The treating provider counseled Mr. Efford on the future neurologic damage, possibly permanent, should he allow his disc herniation to persist without intervention. (*Id.*). Physical examination revealed a positive straight leg test bilaterally, with the left leg test reproducing pain on the right side, diminished strength in the hip due to pain, and diminished sensation in the right foot. (Tr. 525, 588). The treating provider recommended restricting heavy lifting, twisting, and bending because they may exacerbate Mr. Efford's low back pain. (*Id.*).

On November 26, 2019, Mr. Efford attended the Broadway Health Center to establish care with Lydia Lee, M.D. (Tr. 595). Mr. Efford reported feet and leg swelling bilaterally that started two weeks prior. (Tr. 595). He stated it was worse after being on his feet for a long time and better in the mornings after reclining all night. (Tr. 595). Physical examination revealed 1+ pitting edema to the knees bilaterally and thickening skin over the shins with an orange-peel texture and bilateral ankle edema. (Tr. 597-98). Dr. Lee ordered laboratory testing and recommended Mr. Efford elevate his legs and use compression garments. (Tr. 598). Lab results showed elevated creatinine consistent with stage 3a chronic kidney disease and elevated uric acid. (Tr. 599).

10

On December 8, 2019, Mr. Efford returned to the Broadway Health Center for leg and thigh symptoms. (Tr. 606). He reported his leg swelling had worsened. (*Id.*). Physical examination revealed edema present in the right and left lower leg and 1-2+ pitting edema up to the thighs. (Tr. 607).

Mr. Efford saw Dr. Lee on December 10, 2019 for a follow-up appointment. (Tr. 611). He reported his leg swelling had not improved. (Tr. 612). Physical examination revealed bilateral 1+ pitting edema to the knees and thickened skin over the shins with an orange-peel texture. (Tr. 613). Based on his increased creatinine, Mr. Efford was diagnosed with stage 3 chronic kidney disease. (*Id.*). Dr. Lee prescribed Lisinopril for his elevated blood pressure and Lasix for his bilateral leg edema. (*Id.*). Mr. Efford indicated he still takes ibuprofen for gout flares, back pain, and arthritis pain frequently. (Tr. 612). Mr. Efford was counseled to avoid NSAIDs and, in recognition that NSAIDs were his primary medication for gout attacks, Dr. Lee noted she would consider starting a gout prophylaxis if his gout flares increased in frequency. (Tr. 613).

Mr. Efford followed up with Dr. Lee on December 20, 2019. (Tr. 618). Mr. Efford reported taking Lasix without response and increasing the dosage in accordance with Dr. Lee's instructions. (Tr. 618). Mr. Efford's leg swelling was still present. (*Id.*). Mr. Efford also reported that his legs are better when he props them up all night. (*Id.*). Physical examination showed improved blood pressure (while remaining above target), but he continued to exhibit 1+ pitting edema to his knees and thickened, orange-peel textured skin at his shins. (Tr. 619). Dr. Lee ordered iron studies to check for anemia. (Tr. 620).

IV.    **MEDICAL OPINIONS**

State agency medical consultants reviewed Mr. Efford's record at the initial and reconsideration levels. At the initial review, State Agency medical consultant Diane Manos, M.D., adopted the RFC from the prior ALJ's unfavorable decision in 2016. (Tr. 207). The 2016 decision included the following RFC: light work; can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid unprotected heights and moving mechanical parts; and cannot operate a motor vehicle. (Tr. 205). Dr. Manos assessed Mr. Efford's consistency regarding symptom-related limitations and repeated the prior ALJ's determination that Mr. Efford's reports of function "appeared to be a significant exaggeration in light of his relatively unremarkable objective findings." (Tr. 207). Notably, the prior ALJ's unfavorable decision references lumbar spine X-rays that showed only mild degenerative changes at L5-S1, with normal disc spaces and vertebral heights. (Tr. 185).

On reconsideration, Abraham Mikalov, M.D., reviewed updated medical records, including the MRI showing multi-level disc herniations and severe stenosis in the lumbar spine. (Tr. 218). Dr. Mikalov also assessed Mr. Efford's consistency regarding symptom-related limitations and also concluded that the ALJ "determined that [Mr. Efford's] reports of function appeared to be a significant exaggeration in light of his relatively unremarkable objective findings. Current functional limitations are unchanged." (Tr. 219). Dr. Mikalov, like Dr. Manos, adopted the former ALJ's RFC. (Tr. 220).

## THE ALJ'S DECISION

The ALJ's decision, dated February 7, 2020, included the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since October 31, 2018, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments: degenerative disc disease of the lumbosacral spine, hypertension, and obesity (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently. He can sit for six hours and can stand and walk for two hours each in an eight-hour workday. The claimant can climb ramps and stairs occasionally, but he can never climb ladders, ropes, or scaffolds. He can balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally. The claimant can never work at unprotected heights, never move mechanical parts, and never operate a motor vehicle.

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on July 4, 1979 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English. (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969a).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since October 31, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 126-33).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

14

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.   Was claimant engaged in a substantial gainful activity?

2.   Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.   Does the severe impairment meet one of the listed impairments?

4.   What is claimant's residual functional capacity and can claimant perform past relevant work?

5.   Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Efford argues the ALJ's analysis of his subjective statements of disabling pain was very limited and the ALJ failed to articulate his analysis so as to build an accurate and logical bridge between the evidence and the result. (Pl.'s Br., ECF #13, PageID 704-05). The Commissioner responds that the ALJ reviewed the totality of the record and reasonably concluded that Mr. Efford

could perform a limited range of light work. (Comm'r's Br., ECF #14, PageID 711). The Commissioner cites to the ALJ's notation of Mr. Efford's inconsistent treatment and offers its own rationalization why the record supports the ALJ's determination. (*Id.* at PageID 712).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, an ALJ uses the factors set forth in 20 C.F.R. § 416.929(c)(3) to evaluate the individual's statements:

1. A claimant's daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ is not required to analyze all seven factors, but only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The

ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds those complaints to be inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ is required to explain which of an individual's symptoms he found consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

18

Here, the ALJ's analysis of Mr. Efford's subjective statements of disabling pain is deficient.

As is apparent from the following excerpt, while recognizing the demonstrable worsening of Mr.

Efford's condition, the ALJ provided no analysis of Mr. Efford's statements about his pain:

> In considering the claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

> Since the previous [ALJ's] decision on February 29, 2016, the claimant has alleged a significant worsening of his physical condition that has precluded him from engaging in substantial gainful activity on a regular and continuing basis.

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> Physically, I find that, although I find that the totality of the medical evidence for the current adjudicating period has established a significant worsening of the claimant's lumbosacral degenerative disc disease with stenosis and the intermittent onset of gouty arthritis of his bilateral knees, and lower extremity edema from recently-diagnosed chronic kidney disease in the context of hypertension, he has retained the capacity to perform substantial gainful activity within the scope of the reduced range of light exertional and nonexertional physical limitations described in this finding.

> The claimant has retained the ability to walk without any consistent treatment for his otherwise severe spinal stenosis, obesity, and intermittent gouty arthritis within the scope of the exertional limitations described in this finding.

19

Additionally, since December 10, 2019, I find that the claimant has experienced a gradual ameliorative response to Lisinopril and Lasix for edema from chronic kidney disease and previously uncontrolled hypertension. Accordingly, I find that these additional impairments have further restricted him to the residual functional capacity described in this finding.

(Tr. 130) (cleaned up).

As documented above, Mr. Efford testified about the severity of his pain, the effect the pain has on his ability to function, the limited lifestyle he has adopted due to pain, and the methods he uses to obtain relief from the pain at the administrative hearing. He made statements about the pain and its frequency and functionally limiting effects to his medical providers. His medical providers observed some of the functionally limiting effects of his pain and memorialized these observations in treatment notes.

While an ALJ is not required to accept a claimant's subjective complaints, and may discount those complaints, the written decision must articulate what symptoms the ALJ found inconsistent with the evidence of record. *Jones*, 336 F.3d at 475-76; *see* SSR 16-3p. Here, the written decision does not acknowledge any of Mr. Efford's pain- and symptom-related statements and does not provide an analysis of the consistency of those statements with the other evidence in the record. As such, I recommend the Court remand this matter with instructions that the Commissioner analyze Mr. Efford's symptoms in accordance with SSR 16-3p and the pertinent regulations.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: April 28, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice.** *See United States v. Wandahsega,* **924 F.3d 868, 878-79 (6th Cir. 2019).**